***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties prior to the hearing in a Pre-trial Agreement, and at the hearing as: *Page 2 
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. The carrier liable on the risk is correctly named.
4. The employee's average weekly wage is $686.60, which yields a compensation rate of $457.76.
5. Documents entered into evidence include the following:
 a. Stipulated Exhibit #1 — Industrial Commission forms;
 b. Stipulated Exhibit #2 — Medical records of Herman B. Ray (hereinafter referred to as Plaintiff);
 c. Stipulated Exhibit #3 — Discovery responses; Plaintiff's employment file; Westpoint Stevens' personnel file; Workplace Measurement Summary; Information on "Wheels of Faith"; Social Security disapproval letter; Social Security notice of approval; North Carolina Department of Labor correspondence;
 d. Defendants' Exhibit #1 — Termination form.
 *********** ISSUES
The issues for determination include:
1. Did Plaintiff develop an occupational disease in the course and scope of his employment on or about January 24, 2002, as defined by N.C. Gen. Stat. § 97-52?
 2. To what, if any, indemnity benefits is Plaintiff entitled? *Page 3 
3. Is Plaintiff entitled to ongoing medical treatment for injuries sustained due to the alleged accident arising out of and in the course of his employment?
4. Is Plaintiff entitled to have medical bills paid for injuries sustained due to the alleged accident arising out of and in the course of his employment?
5. Is Plaintiff entitled to reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
6. Does Plaintiff suffer from an occupational disease, and if so, to what benefits is he entitled as a result thereof?
7. Are Defendants entitled to reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 47 years old. Plaintiff did not complete high school, nor did he obtain his General Equivalency Diploma.
2. Mountaire Farms (hereinafter referred to as Defendant-Employer) hired Plaintiff as a live haul driver in the summer of 1999. In that capacity, Plaintiff was responsible for moving live chickens from farms to the processing plant. Defendant-Employer made a work schedule, but it was not at all unusual for Plaintiff to be called at home and told to come into work. *Page 4 
3. Plaintiff's shift began with his going into the plant and picking up his transport truck and trailer. He was required to do a pre-trip inspection prior to heading out to the farm to pick up the chickens. The pre-trip inspection mainly focused on the safety items of the truck and trailer. The trailer would be loaded with empty cages, which would then be loaded with chickens at the farm for the return trip. Some of the farms were a short distance from the plant, but some were two (2) to three (3) hours away.
4. Upon arrival at a farm, Plaintiff would take his place in line and wait to be loaded. A trip without any problems or delays should have the truck loaded in 30 to 45 minutes, and Plaintiff back on the road to the plant shortly thereafter. However, this type of turnaround time was rare. Plaintiff sometimes encountered delays at the farms due to issues specific to a farm, such as lack of workers to catch the chickens. A normal wait time would actually be about two (2) hours for the truck to be loaded.
5. Plaintiff was also responsible for ensuring that the cages were locked down and clean. Plaintiff testified that nothing should be able to fly off the trailer, in order to prevent accidents from occurring. As such, Plaintiff would pull dead chickens from the cages on the trailer prior to departure. Dead chickens were not supposed to be loaded, but occasionally this would happen, and it was the driver's responsibility to ensure that the dead chickens were not transported. Plaintiff also assisted other drivers with getting their cages unhooked, or whatever else needed to be done while waiting to be loaded.
6. During the hot months of the year, Plaintiff was responsible for keeping the chickens cool by watering them during the loading phase. A very large fan, run by a diesel engine, was also utilized to keep the chickens cool prior to transport. Plaintiff would be splattered with chicken feces due to the water and fan being used to keep the chickens cool, and *Page 5 
in turn, Plaintiff's clothing would become dingy due to the moisture from the spray. Drivers were not given respirators to use while working at the farms. The drivers were instructed not to stop along the route when they were carrying live chickens, in order to minimize the number of chickens dying from the heat.
7. Upon arrival at the plant, Plaintiff would back his trailer up into the shed, described by Plaintiff as a big holding pen that had water sprinklers and several fans in it in order to keep the chickens cool. Plaintiff would drop his trailer off and then check to see if he had another run to make. If so, he would go pick up the trailer and repeat the process.
8. Opportunities to clean themselves were not readily available to the drivers. There was a water supply at the farms, but Plaintiff was suspicious of the water's origin, and thus did not use it. The only restrooms available to the drivers required them to enter the chicken houses, so instead, many times the preferred choice of the drivers was to walk out to the tree line to relieve themselves. Later, O.S.H.A. inspected the farms and ordered that restrooms be installed for the drivers.
9. Plaintiff began to feel ill in August 1999, and so he presented to U.S. Healthworks of NC, P.C. (hereinafter referred to as U.S. Healthworks), where the medical staff diagnosed him with bronchitis. He initially did not think anything of the diagnosis. At this time, no medical provider related his condition to his work with the chickens. Plaintiff followed up with U.S. Heathworks for continued sinus, breathing, and coughing problems. In December 1999, Plaintiff was given the diagnosis of "reactive airway disease," and issued a prescription for Albuterol and a Medrol Dosepak. Plaintiff returned to U.S. Healthworks 10 days later (January 10, 2000) with an improved condition. The diagnosis then changed to asthma, and he was given additional medications. *Page 6 
10. Defendant-Employer terminated Plaintiff from his job in January 2000 as a result of Plaintiff being charged with driving while impaired. Also in January 2000, Plaintiff began treatment with Johnson Medical Clinic, where the physicians continued with a working diagnosis of asthma. In March 2000, Plaintiff informed Defendant-Employer that the driving while impaired charge resolved, and as a result, Defendant-Employer re-hired Plaintiff and placed him in a "trainer" position. The "trainer" position also required that Plaintiff drive routes.
11. Plaintiff continued to experience health problems after his return to work with Defendant-Employer. He was constantly tired, and he had a continual cough, and so Plaintiff continued treatment with Johnson Medical Clinic for these symptoms.
12. Due to his deteriorating health condition, Plaintiff requested that Defendant-Employer move him to another position transporting processed chickens. Around the same time, Defendant-Employer arranged for Plaintiff to undergo his Department of Transportation (hereinafter referred to as D.O.T.) physical. Defendant-Employer terminated Plaintiff from his job on May 24, 2001 because the physician who performed the D.O.T. physical diagnosed Plaintiff with asthma, as well as because the D.O.T. physical revealed that Plaintiff had had back surgery, but Plaintiff failed to inform Defendant-Employer of this condition at the time of his hire.
13. After his termination, Plaintiff started his own business of operating an ice cream truck. The business was moderately successful; however, Plaintiff's health was not improving, rendering him unable to perform the work duties required with running such a business, and so Plaintiff had to give up the business. *Page 7 
14. In September 2001, Plaintiff found employment with Westpoint Stevens as a lift driver. Plaintiff worked there until January 2002, when he walked through a smoke-filled room, which triggered a coughing spell wherein he coughed up blood.
15. Plaintiff eventually came under the care of Dr. Somnath Naik. Dr. Naik is board certified in internal medicine and pulmonary medicine.
16. Dr. Naik first examined Plaintiff on January 15, 2002, and then Plaintiff presented to the hospital on January 24, 2002. Dr. Naik originally believed Plaintiff to be suffering from sarcoidosis, and so he recommended a lung biopsy, the results of which supported a diagnosis of either sarcoidosis or hypersensitivity pneumonitis. However, over the course of the next few months, Dr. Naik had the opportunity to run further tests, and to review the results of further testing, which caused him to rule out sarcoidosis.
17. Dr. Naik referred Plaintiff to Dr. Peter Cussin at Duke University Medical Center for an evaluation of interstitial lung disease and possible sarcoidosis. Dr. Cussin was not deposed, but his medical notes indicate that Plaintiff had symptoms out of proportion to his spirometric and lung volume limitation, as well as his radiographic findings. Dr. Cussin further noted that he suspected that Plaintiff did have hypersensitivity pneumonitis, that he should not return to the chicken plant, but that he did not believe Plaintiff had sarcoidosis.
18. Dr. Naik questioned his diagnosis of hypersensitivity pneumonitis by the time of his deposition because Plaintiff was no longer working in an environment where he was exposed to live chickens, and because he was of the opinion that Plaintiff's hypersensitivity pneumonitis should have gotten better without treatment once the exposure ended. Dr. Naik testified that the test subsequently done for avian proteins in 2005, which he needed to make a diagnosis of hypersensitivity pneumonitis, turned out negative. *Page 8 
19. Dr. Naik testified at his deposition that his diagnosis leaned more toward sarcoidosis rather than hypersensitivity pneumonitis from occupational exposure to chickens. Dr. Naik was of the opinion that if Plaintiff's breathing tests were normal one month after he stopped working for Defendant-Employer, it was very unlikely that he had hypersensitivity pneumonitis. However, Dr. Naik further testified that if Plaintiff was on steroid medication, his pulmonary function tests could have been normal, even if he had hypersensitivity pneumonitis.
20. Plaintiff sought additional evaluations from Dr. Fred McQueen from July 2002 through May 2003. Dr. McQueen indicated that Plaintiff had severe chronic obstructive pulmonary disease with end stage lung disease, and was permanently and totally disabled from employment. Dr. McQueen further noted that Plaintiff had pneumonia secondary to exposure to chicken products, that Plaintiff's living near the chicken farm was the exposure causing this problem, and that Plaintiff needed to move as soon as possible.
21. Within a month of seeing Dr. Kussin on July 25, 2002, Plaintiff presented to the emergency room at Southeastern Regional Medical Center with complaints of shortness of breath and congestion, where the medical staff examined him and instructed him to follow up with his family doctor.
22. Defendant-Employer arranged for Plaintiff to be evaluated by Dr. William F. Credle, Jr., who is board certified in internal medicine and pulmonary medicine. Dr. Credle examined Plaintiff in February 2004.
23. Dr. Credle testified that hypersensitivity pneumonitis is a reaction of the lungs to something to which one is exposed. It can lead to an immune reaction, which can lead to inflammation, and the inflammation can lead to scarring of the lungs. Dr. Credle testified that an immune reaction can happen when one breathes in something to which one is allergic, and it *Page 9 
causes an inflammatory reaction in the lungs. Dr. Credle further testified that exposure to chicken feces and other occupational items like cedar shavings can cause this problem. Dr. Credle also testified that some patients get over their reaction rather quickly, while others suffer from lingering effects.
24. Dr. Credle opined that even though Plaintiff's exposure was sufficient to lead to hypersensitivity pneumonitis, since his employment ended in May 2001, and pulmonary functioning tests done a month after his employment ended showed no abnormalities, a diagnosis of hypersensitivity pneumonitis from working for Defendant-Employer would be highly unlikely. Dr. Credle was of the opinion that Plaintiff had no disability related to exposure to live chickens.
25. Dr. Thaw Sint, who is also an expert in internal medicine and pulmonary medicine, saw Plaintiff on March 25, 2005. Dr. Sint testified that he treated Plaintiff based on a previously given working diagnosis of hypersensitivity pneumonitis. However, he could not opine to a reasonable degree of medical certainty that Plaintiff had hypersensitivity pneumonitis, although he felt this diagnosis was more probable than sarcoidosis. With respect to whether Plaintiff's working exposure to chicken feces in his employment with Defendant-Employer caused or contributed to his development of hypersensitivity pneumonitis, Dr. Sint would only testify that Plaintiff's working exposure to such chicken products would be another piece of information in support of attributing his clinical syndrome to such exposure, but he could not make a diagnosis on that piece of information alone. Dr. Sint further testified that the likely cause of hypersensitivity pneumonitis is repeated exposure to an antigen in the environment, but a number of different things in the environment can cause hypersensitivity pneumonitis, including exposure to live chickens. As such, Dr. Sint could not give an opinion on whether *Page 10 
Plaintiff's exposure to live chickens caused him to develop hypersensitivity pneumonitis. In response to questioning from defense counsel, Dr. Stint testified that it is possible and it is likely that exposure to chicken products while employed by Defendant-Employer caused Plaintiff's hypersensitivity pneumonitis, but he was not 100 percent sure. To add to the confusion of this testimony, Dr. Stint later testified that he could not answer the same question to a reasonable degree of medical certainty, but rather, he could say that "it's a possibility, so therefore, it is likely."
26. The only work restriction Dr. Sint would have imposed on Plaintiff was for Plaintiff not to return to work at the chicken plant.
27. Based upon the greater weight of the evidence, the Full Commission finds that Plaintiff failed to prove that he has hypersensitivity pneumonitis, or that he contracted this condition as a result of his employment with Defendant-Employer. Neither the medical opinions of Dr. Credle, Dr. Stint, nor Dr. Naik establish that Plaintiff's employment with Defendant-Employer caused or significantly contributed to the development of Plaintiff's condition. Further, the Full Commission finds, by the greater weight of the evidence, that Plaintiff failed to prove that his employment placed him at a greater risk over that of the general public not so employed of contracting hypersensitivity pneumonitis, or some other disabling occupational disease. Plaintiff offered no expert opinion testimony on this issue.
28. Based upon the greater weight of the evidence, Plaintiff failed to establish that he is incapable of working in any employment due to a compensable occupational disease. Further, the greater weight of the medical evidence does not establish that Plaintiff is incapable of working in any employment. *Page 11 
29. Due to the complex medical and factual issues involved in this case, Plaintiff had reasonable grounds to pursue his claim, and Defendants defended this claim with reasonable grounds. Therefore, neither Plaintiff nor Defendants should be sanctioned pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff failed to establish that as a result of his employment with Defendant-Employer, he contracted hypersensitivity pneumonitis, or any other compensable occupational disease, within the meaning of N.C. Gen. Stat. § 97-53(13) (2007). Further, Plaintiff failed to establish that he has hypersensitivity pneumonitis or any other disease which is due to causes and conditions which are characteristic of and peculiar to his employment with Defendant-Employer, and are not ordinary diseases of life to which the general public is equally exposed outside of Plaintiff's employment. Id. In Rutledge v. Tultex Corp./King'sYarn, the North Carolina Supreme Court held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: (1)characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./King's Yarn, 308 N.C. 85, 93, 301
S.E.2d 359, 365 (1983). In this case, Plaintiff has not met his burden of proof with respect to any of these elements. *Page 12 
3. Plaintiff failed to establish that he suffered any disability as a result of a compensable occupational disease. N.C. Gen. Stat. § 97-29
(2007).
4. Neither party is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act is DENIED.
2. Each side shall pay its own costs.
This the __ day of May 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1